**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION AT LEXINGTON**

| | |
|---|---|
| **IN RE CLASSICSTAR MARE LEASE** | **MDL No. 1877** |
| **LITIGATION** | **Master File** |
| | **Civil Action No. 5:07-cv-353-JMH** |

**And**

| | |
|---|---|
| **SEA SONG FARMS, LLC,** | |
| **LEWIS T. TEFFEAU and** | |
| **LINDA S. TEFFEA,** | **Plaintiffs,** |

**v.**

| | |
|---|---|
| | **JURY TRIAL DEMANDED** |
| **WILMINGTON TRUST FSB,** | |
| **S. DAVID PLUMMER,** | **Civil Action No. 09 -_____** |
| **SPENCER PLUMMER,** | |
| **KARREN, HENDRIX, STAGG, ALLEN &** | |
| **COMPANY, P.C., and TERRY L. GREEN,** | |
| | **Defendants.** |

## COMPLAINT

1.      For their Complaint against the Defendants, the Plaintiffs Sea Song Farms, LLC ("Sea Song"), Lewis T. and Linda S. Teffeau (hereinafter sometimes referred to as the Teffeaus") together (collectively sometimes referred to as "Plaintiffs"), through counsel, plead as follows:

### I.      INTRODUCTION

2.      Acting in concert over the past several years, the Defendants have managed, operated, promoted and sold a Kentucky-based thoroughbred horse breeding program as a vehicle used to defraud unsuspecting purchasers of thoroughbred interests and the United States government out of hundreds of millions of dollars.  The scheme

originated when the operators of thoroughbred mare leases, S. David Plummer ("Plummer") and Spencer Plummer ("Spencer") joined forces with Wilmington Trust of Pennsylvania, n/k/a Wilmington Trust FSB ("Wilmington Trust) and other promoters, to market and sell business opportunities involving thoroughbred horses to wealthy individuals, including Plaintiffs.  Operating from a thoroughbred farm in Central Kentucky named ClassicStar Farms, LLC, with a sales force stretching from coast to coast, Defendants aggressively promoted, marketed and sold ClassicStar Programs (the "Programs" or "ClassicStar Programs") to wealthy individuals, most of who had no prior knowledge of or experience in the thoroughbred horse industry.

3.      Federal criminal authorities are currently conducting investigations into the activities of some of the Defendants relating to the fraudulent promotion, marketing and sales of the Programs.  In February 2006, acting on federal search warrants, the Criminal Investigative Division of the Internal Revenue Service ("CID") raided the farm, seized the books and records pertaining to the ClassicStar Programs.

**The Advantages of Mare Leasing**

4.      Mare leasing represents one method of participating in the thoroughbred industry.  Rather than investing in a mare directly by way of outright purchase, the participant leases the rights to the mare for the breeding season and then selects a stallion to breed with the leased mare, retaining or selling the foal that results from the breeding. The arrangement also may include the price of a stallion stud fee, boarding for the mare and/or foal and insurance.  Since the gestation period for a horse is eleven months and the mare cannot safely be bred for a period thereafter, a mare lease would render the mare unavailable for use in other mare lease programs for an extended period of time.  The

time period a leased mare would be unavailable to other purchasers of mare lease programs also varies depending on when during the breeding season the mare becomes pregnant.

5. Participation in the equine industry has certain tax benefits. A taxpayer that is actively engaged in the horse business is, according to the Defendants, entitled to deduct as ordinary and necessary business expenses the amounts that the taxpayer expends in connection with the business during any tax year. Such ordinary expenses would include insurance, board fees, stud fees, and the cost of leasing a mare. The Plaintiffs have become and remain Kentucky thoroughbred horse breeders by actively engaging in the horse business since their involvement with ClassicStar.

6. As marketed and promoted by the Defendants, the Programs were not designed as "tax shelters". Rather, the Programs gave Plaintiffs (and dozens of other purchasers) the opportunity to start a tax-advantaged, agricultural-based business by purchasing thoroughbred breeding interests purportedly worth millions of dollars with the potential to own, sell, train and race the thoroughbred offspring. One of the tax advantages associated with the Programs was that the purchasers were permitted to pay for their thoroughbred breeding businesses partly with IRS refunds of previous years taxes generated by virtue of participating in the Program.

7. Another tax advantage of the Programs as marketed and sold by Defendants was that participants would be able to convert ordinary income into capital gains (and thus enjoy substantial tax savings) provided the foals where held for at least two years. Generally, when a mare (whether leased or purchased) is bred to a stallion and produces a foal that is sold, the net revenue generated would be taxable to the

owner/seller as ordinary income.  Since the cost of producing the foal was previously deducted from ordinary income, the taxpayer would have no basis in the foal, making the sales proceeds (net of selling expenses) taxable as ordinary income.

8.     However, when a taxpayer purchases a horse for breeding or racing purposes and owns the horse for at least two years before selling, any gain on the sale would be treated as long-term capital gains which is subject (in the highest tax bracket) to 15% taxation, as opposed to the 37% tax rate applicable to ordinary income.  By participating in the Programs, Defendants explained that Plaintiffs could legally convert ordinary income (taxed at 37%) to capital gains (taxed at 15%) as long as they actually participated in the business and owned the foals for at least two years.

**The Fraudulent Scheme**

9.     Defendants deliberately created, marketed and sold Programs with a total value many times greater than the thoroughbred interests owned by ClassicStar and/or its affiliates.   To conceal the fact that the same mares were being marketed and leased to multiple participants, Defendants encouraged Program participants to exchange their thoroughbred interests for interests in a variety of other business opportunities, including oil and gas ventures.  This, of course, would buy Defendants more time to operate the scheme.

10.     Upon information and belief, in 2003 alone, the Defendants succeeded, by virtue of their fraudulent practices, in selling more than $100 million of Programs at a time when ClassicStar and its related affiliates owned approximately $40 million of thoroughbred equine bloodstock.   Plaintiffs herein purchased over $7 Million of thoroughbred interests in 2003 (and another $5.3 Million in 2004) upon the

recommendation and advice of their tax specialists and wealth managers, Kevin Coccetti ("Coccetti") and Marty Wolf ("Wolf") of Wilmington Trust.

11.    As part of its scheme to market the Programs to as many wealthy individuals as possible, Karren Hendrix, Plummer, Spencer, and Green (together referred to as the "CS Defendants") and ClassicStar, LLC (an unnamed bankrupt entity) set out to find, and successfully engaged, a nationwide team of promoters, including Wilmington Trust, to actively participate in the operation, management and proliferation of the scheme by recommending the Program to its wealthy clients.[1]

**Wilmington Trust Promotes ClassicStar Programs**

12.    Upon information and belief, Wilmington Trust learned about the ClassicStar Programs in May 2002 when David Forman (hereinafter referred to as "Forman") of Private Consulting Group (hereinafter referred to as "PCG") conducted an invitation-only seminar in New Jersey for financial advisors and money managers.  Marty Wolf of Wilmington Trust attended the seminar and heard the presentation of Defendant S. David Plummer extolling the benefits of participating in mare leasing *via* the ClassicStar Programs.

13.    In July 2002, Plaintiffs were finalizing the sale of their five businesses and Wilmington Trust was hired by Plaintiffs to provide independent and objective wealth management and tax planning services for the money they were to receive from the sale.  However, Wilmington Trust was instead soliciting, recommending and persuading its existing and prospective clients, like Plaintiffs, to purchase as much of the Programs as they could, which was critical to the success of the scheme.  Wilmington Trust was

---

[1]    The CS Defendants also enlisted the promotional services of other agents to market, promote and sell the Programs, including the Private Consulting Group, a nationwide wealth management firm with independent offices in 16 states, and Anderson Corporate Finance & Investments, Inc.

neither objective nor independent – the bank and its agents were being paid secret commissions and fees to market and sell the Programs to their clients, including Plaintiffs.

14.     Wilmington Trust brought the ClassicStar Programs to Plaintiffs and other of their wealth management clients.  Wilmington Trust joined forces with, and introduced Plaintiffs to PCG and Forman to assist Wilmington Trust with marketing and promoting the Programs to Plaintiffs.  Wilmington Trust recommended and encouraged Plaintiffs and others to participate in the fraudulent and overpriced Programs, and they shared in the proceeds of the scheme, through commissions, interest and fees generated from the Programs purchased by their clients.

15.     Wilmington Trust's participation in the scheme was the *sine qua non* of the fraudulent enterprise *vis a vis* these Plaintiffs, and was critical to the operation and success of the unlawful scheme.   Wilmington Trust encouraged Plaintiffs' participation by agreeing to loan Plaintiffs, and other of its clients, millions of dollars to open businesses in the thoroughbred industry *via* the ClassicStar Programs.  Tellingly, Wilmington Trust declined to collateralize its loans to Plaintiffs or take a security interest in the ClassicStar Programs or the underlying thoroughbred horse interests.  Rather, Wilmington Trust protected its capital by obtaining a security interest in Plaintiffs' other real estate and investment assets held by the bank.

16.     Upon information and belief, Wilmington Trust knew it could not take a security interest in the Programs, as all of the equine interests owned by the ClassicStar entities, including the mares, stallion nominations, foals (both born and unborn), and the insurance policies sold to Plaintiffs as part of their Programs, were subject to various

prior perfected security agreements executed by the ClassicStar entities in favor of its lenders.

17.     Wilmington Trust promised Plaintiffs that they would conduct comprehensive due diligence, *i.e.,* "scrubbing", on any money manager, business opportunity, tax strategy, investment or wealth preservation strategy <u>before</u> they presented the same to Plaintiffs for consideration.  Wilmington Trust claimed to have done such due diligence on the Programs that it recommended to Plaintiffs.

18.     Coccetti and Wolf travelled with Plaintiffs to Lexington, Kentucky to examine the ClassicStar facilities and its thoroughbred horses.  In their January 2003 trip to Lexington, Wilmington Trust, through its professional agents, Coccetti and Wolf, encouraged Plaintiffs to invest in the 2003 ClassicStar Program and Wolf and Coccetti touted the Programs after reviewing and approving the ClassicStar promotional materials. Based upon Wilmington Trust's due diligence conducted prior to and during the trip to Kentucky, and based upon Wilmington Trust's strong recommendations, Plaintiffs decided to invest in the 2003 Program during Mr. Teffeau's due diligence trip to Central Kentucky.  Wilmington Trust knew, or should have known in the exercise of reasonable care (or if they had conducted the level of due diligence that they promised), that the Programs were fraudulently overpriced.  For instance, Plaintiffs were charged (and paid) nearly $917,000 for prospective foal insurance in the 2003 Program, far more than the costs of such insurance according to the promotional materials purportedly "scrubbed" by Wilmington Trust.

19.     Wilmington Trust knew, or in the exercise of reasonable care should have known, that mares, stallion nominations, foals (born and unborn) and the insurance sold

to Plaintiffs were encumbered by prior, perfected liens and security interests held by creditors, including Fifth Third Bank. Wilmington Trust knew, or in the exercise of reasonable care should have known, that more mares were being leased than there were mares owned by ClassicStar - unless the purchasers agreed to convert the Programs to some other business entity or venture. Wilmington Trust knew, or in the exercise of reasonable care should have known, that the Programs they were promoting were fatally flawed in the manner described in this Complaint, but Wilmington Trust failed to warn their clients of these facts. Rather, Wilmington Trust induced Plaintiffs to invest nearly one-half of their entire net worth in the fraudulent scheme, and recommended the Programs to other Wilmington Trust clients (including but not limited to Leo Hertzog and Tom Morello) to earn hidden commissions and fees, and to generate additional interest income for the bank.

20. Based upon all the Defendants' active involvement in the management and operation of the criminal enterprise, and based upon all the Defendants' intentional fraudulent misrepresentations, omissions and other illegal actions related to the Kentucky-based Programs, Plaintiffs bring this action against Defendants pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et. seq.*, and the laws of the Commonwealth of Kentucky. Defendants engaged in such violations directly and as co-conspirators as detailed hereinafter. The state law claims made herein arise out of the same transaction or occurrence, or series of transactions or occurrences and/or from a common nucleus of operative facts that form the basis of the RICO causes of action.

## II.        PARTIES and Other Key Players

21.    **Plaintiffs.**    Plaintiff Sea Song Farms, LLC ("Sea Song") is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business at 301 Oxford Valley Road, Suite 1903-B, Yardley, Bucks County, Pennsylvania 19067.   Sea Song was formed to own and operate the Teffeaus' interests in thoroughbred horses, which horses are bred and boarded in central Kentucky. Sea Song is a Kentucky thoroughbred breeder which is authorized to conduct business in the Commonwealth of Kentucky and which conducts all of its thoroughbred breeding operations in Central Kentucky.

22.    Plaintiff Lewis T. Teffeau, an individual, is the president and an owner of Sea Song.  Mr. Teffeau is married to Plaintiff Linda S. Teffeau.  He is a resident and citizen of Meggett, Charleston County, South Carolina.

23.    Plaintiff Linda S. Teffeau, an individual, is an owner of Sea Song and the wife of Plaintiff Lewis T. Teffeau.  Linda Teffeau is a resident and citizen of Meggett, Charleston County, South Carolina.

24.    **Defendants.**   Defendant Wilmington Trust FSB ("Wilmington Trust") is a federally chartered savings bank and is the successor of a merger with Wilmington Trust of Pennsylvania.  Wilmington Trust maintains its principal place of business in Baltimore, Baltimore County, Maryland. Wilmington Trust, along with its affiliated companies, claims to be among the country's most esteemed wealth managers. Wilmington Trust was part of the nationwide promotional and sales team engaged by ClassicStar, and/or one or more of the CS Defendants to promote and sell the fraudulent

Programs.   Wilmington Trust introduced Plaintiffs to the CS Defendants and the Programs and recommended the Programs to the Plaintiffs.

25.     Defendant S. David Plummer ("Plummer"), an individual, is, upon information and belief, a citizen and resident of the State of Utah with a residence or place of business in Farmington, Davis County, Utah. He served as President of ClassicStar from July 1, 2001 until January 1, 2003, and thereafter was the Director of Marketing for ClassicStar.  Plummer's employment with ClassicStar was terminated on or about February 1, 2006.

26.     Defendant Spencer Plummer ("Spencer"), an individual, is the eldest son of Plummer.  Spencer is a citizen and resident of the State of Utah with a residence or place of business located in Farmington, Davis County, Utah.  He served as Vice President of ClassicStar and was promoted to President on or about January 1, 2003.  His employment with ClassicStar was terminated on or about February 1, 2006.

27.     Defendant Karren, Hendrix, Stagg, Allen & Company, P.C. ("Karren Hendrix"), a Utah corporation, is an accounting firm that employed Defendant Green at all times material and relevant hereto.  Upon information and belief, the firm's principal place of business is located at 111 East Broadway, Suite 250, Salt Lake City, Salt Lake County, Utah 84111 and its registered agent at that address is G. John Runia, CPA.  Upon information and belief, prior to 2003, the firm was known as Karren, Hendrix & Associates.

28.     Defendant Terry Green ("Green"), an individual, was at times material and relevant hereto the primary accountant for the ClassicStar Programs.  He is, upon information and belief, a citizen and resident of Utah with a resident or place of business

located in Salt Lake City, Salt Lake County, Utah. Green touted the tax advantages and profit opportunities of the ClassicStar Programs in electronic, telephonic and paper marketing materials directed to Plaintiffs.

29.     Together Plummer, Spencer, Karren Hendrix and Green are referred to hereinafter as the "CS Defendants".

30.     At all times relevant to this Complaint, each of the Defendants was and is a "person" as that term is defined in 18 U.S.C. §1961 and used in 18 U.S.C. §1962.

**Other Key Players in the Fraudulent Scheme**

31.     **Kevin Coccetti.**     At times material and relevant hereto, Kevin Coccetti ("Coccetti") was employed by Wilmington Trust as a Vice President in its Doylestown, Pennsylvania branch office. Coccetti, along with Martin Wolf, worked with Plaintiffs and recommended the Programs at issue herein. Upon information and belief, Coccetti's employment at Wilmington Trust was terminated after several months of administrative leave as a result of his role in recommending the Programs to Plaintiffs and other clients of Wilmington Trust.

32.     **Marty L. Wolf.**     At times material and relevant hereto, Martin L. Wolf, a/k/a Marty Wolf ("Wolf") was employed by Wilmington Trust as a Vice President in its Villanova, Pennsylvania main office. Wolf was presented by Wilmington Trust to be a licensed Pennsylvania attorney and a licensed Pennsylvania certified public accountant with specialized tax expertise and knowledge of the thoroughbred industry. Upon information, belief and investigation, Wolf was neither a Pennsylvania licensed attorney nor CPA since his licensures became inactive in the late 1980's. Upon information and belief, Wolf's employment at Wilmington Trust was terminated after

several months of administrative leave as a result of his role in recommending the Programs.  Wolf filed for Chapter 13 protection in the United States Bankruptcy Court, Eastern District of Pennsylvania, Case No. 07-16013-bif, on October 15, 2007.

33.  **ClassicStar, LLC.**    ClassicStar, LLC ("ClassicStar") is a Utah limited liability company with a registered agent in Kentucky.  Its principal business activity was to own and operate two thoroughbred horse farms in Versailles, Kentucky from which it created, marketed and sold the ClassicStar Programs at issue herein.  ClassicStar filed for Chapter 7 bankruptcy protection in the United States Bankruptcy Court for the Eastern District of Kentucky, Lexington Division (Case No. 07-51786 WSH) on September 14, 2007.   On April 14, 2008, the bankruptcy case was converted from a Chapter 11 (reorganization) to a Chapter 7 (liquidation). ClassicStar, through its officers, directors and employees owned and operated two horse farms (ClassicStar Farms, LLC) with approximately 600 acres and have employed approximately 40 individuals in Central Kentucky.

34.  **ClassicStar Farms, LLC.**    ClassicStar Farms, LLC ("ClassicStar Farms") is an inactive limited liability company organized under the laws of the Commonwealth of Kentucky, with its principal place of business in Versailles, Kentucky. ClassicStar Farms was the "storefront" of the fraudulent scheme which encompassed some 600 acres in Versailles, Woodford County, Kentucky.  ClassicStar Farms was the nucleus of the ClassicStar operations.  Many of the mares utilized in the ClassicStar programs and foals born thereto were boarded and raised on ClassicStar Farms.

35.  **Geostar Corporation.**    GeoStar Corporation ("GeoStar") is a closely held, oil and gas exploration corporation organized and existing under the laws of

Delaware with a registered agent located in Michigan. Tony Ferguson and Thom Robinson are primary shareholders of GeoStar.  GeoStar is a corporation that owns, or at times material hereto owned, directly or indirectly through subsidiaries, ClassicStar. In addition to ClassicStar, GeoStar at times material hereto owned approximately 15% of Gastar, a publicly traded oil and gas exploration company.

36.     **Tony Ferguson.**     Tony Ferguson ("Ferguson") is, upon information and belief, a citizen and resident of Florida with a residence and/or place of business located in Tampa, Florida. He is, or was at all times material hereto (except for a short period in 2004, when the position was held by Thom Robinson), the Managing Member of ClassicStar. Ferguson is also a principal shareholder of GeoStar.

### III.     JURISDICTION AND VENUE

37.     Pursuant to 28 U.S.C. §1331, this Court has original jurisdiction over the subject matter of this case because all or part of the claims arise from the defendants' violations the United States Code, including the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. §1961, *et. seq*.

38.     This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) as it involves citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

39.     This Court has supplemental jurisdiction over the subject matter of the claims asserted herein that arise under state law pursuant to 28 US.C. §1367(a) and pursuant to the doctrines of pendent and ancillary jurisdiction, because the state law claims arise from a common nucleus of operative facts which give rise to the federal claims alleged in this case.

40.     This Court has personal jurisdiction over each of the Defendants in this action pursuant to 18 U.S.C. §1965(a), (b) and (d) and KRS 454.210, as each regularly transacts business in Kentucky or has minimum contacts with Kentucky through their paid participation in the promotion, management, operations and sale of the Kentucky-based ClassicStar Programs such that it is reasonable for this Court to exercise jurisdiction over them.

41.     Venue is proper in this district pursuant to 18 U.S.C. §1965(a), (b) and (d) in that the Programs, *i.e.*, the fraudulent schemes, were developed, marketed and sold from this federal district, and because one or more of the defendants reside, are found, have agents, or transact their affairs within this district and because the ends of justice will be met by laying venue in this district.

42.     Moreover, venue properly lies in this Court pursuant to 28 U.S.C. §1391(a)(2) and (b)(2) in that a substantial part of the events and omissions giving rise to the claims and the property that is the subject of this action, *i.e.,* the Programs, Plaintiffs' decision to participate in the Programs and the underlying thoroughbred horses, are situated in this district.

### IV.     FACTUAL BACKGROUND

43.     Plaintiffs Lewis T. and Linda S. Teffeau are a retirement-aged, married couple.  Mr. Teffeau retired a successful businessman and entrepreneur.  From 1978 until 2002, Mr. Teffeau and his business partner (Leo Hertzog) built up and operated five printing and direct mail companies situated throughout the United States.  Teffeau began his relationship with Wilmington Trust of Pennsylvania in or around 2001, but initially only in its capacity as a commercial bank for his business and personal banking needs.

44.     In July 2002, Mr. Teffeau and his business partner sold their companies to a private equity firm for a substantial sum of money.  This event presented the Teffeaus with a situation that they had not previously encountered; the daunting task of protecting the (now) liquid wealth they had amassed from the myriad of financial, tax and investment risks existing in the modern world. The Teffeaus turned to Wilmington Trust to guide them and to professionally and prudently counsel them through these uncharted waters.  Specifically, the Teffeaus hired Wilmington Trust to recommend and implement prudent and objective tax planning strategies, wealth protection strategies and investment planning strategies to preserve, safeguard and invest their substantial (largely liquid) wealth.

45.     Wilmington Trust and its affiliated companies purport to adhere to the highest business and ethical standards in their dealings with clients, including the Teffeaus.  It claims to offer a unique approach to each client's financial situation and to follow traditional principles of prudent business practices.  In particular, Wilmington Trust (and its affiliated companies) claim that avoiding conflicts of interest is paramount, representing that it would always avoid actual conflicts of interest or even the appearance of any conflicts of interest, and that its private interests would not interfere with the best interests of its clients.  Wilmington Trust further states on its affiliated website:

> Our approach is simple – develop customized strategies for our clients with the utmost integrity, intelligence and expertise.  You're assured that your performance expectations and aspirations for the future are always paramount to us.  'Peace of mind and performance.  The cornerstone of our approach to wealth management.'

It is this aura of integrity, stability and prudence that led the Teffeaus to entrust essentially all of their accumulated wealth to Wilmington Trust.

46.     As part of its services, Wilmington Trust told Plaintiffs that they would conduct comprehensive due diligence on any advisor, business opportunity and/or program brought to the Teffeaus for consideration.  Plaintiffs were repeatedly told by Coccetti, Wolf and others at Wilmington Trust that a business opportunity, program or advisor would not be presented to them until and unless the opportunity, program or advisor had been "scrubbed" by the professionals at Wilmington Trust.  Wilmington Trust advised Plaintiffs that its "scrubbing" entailed comprehensive and disinterested research, analysis and evaluation of a particular program or advisor recommended by Wilmington Trust to its clients.  No business opportunity, investment, program or advisor would be presented to the Teffeaus prior to the completion of Wilmington Trust's comprehensive due diligence, and its recommendation of a program, strategy or advisor meant such program, strategy or advisor had withstood Wilmington Trust's scrutiny and was suitable to the Teffeaus' financial objectives and needs.

47.     As it turns out, the two ClassicStar Programs recommended by Wilmington Trust have led to huge financial losses.  Moreover, the recommended Programs have resulted in an ongoing IRS audit costing the Teffeaus hundreds of thousands of dollars in legal and accounting fees in addition to the disastrous tax consequences (including millions of dollars in interest and penalties potentially due to the IRS).

**The ClassicStar Programs.**

48.     On July 31, 2002, Teffeau and Hertzog finalized the sale of their five businesses.  The Teffeaus' 51% interest netted them approximately $24 Million after payment of debts and obligations.  The Teffeaus turned to Wilmington Trust – a firm the

Teffeaus believed to be the country's premier wealth manager - to recommend and implement strategies to protect and preserve their substantial (now liquid) wealth.

49.     Wilmington Trust's solicited Plaintiffs to breed, own and raise thoroughbred horses in and around Lexington, Kentucky.  To these ends, Wilmington Trust, through Coccetti and Wolf, introduced the Teffeaus to the CS Defendants and the ClassicStar Program.

50.     Initially, the CS Defendants did not have access to a sufficient number of wealthy individuals (with no prior experience in the thoroughbred industry) to accomplish its purposes so they (along with ClassicStar) devised a plan to attract and then systematically defraud persons interested in acquiring mare leases by: 1) inflating the value of the Programs; and 2) by selling as many Programs as possible to as many unsuspecting participants as possible.

51.     In 2002, The CS Defendants and ClassicStar set out to form a national team to aggressively promote and sell far more Programs than the thoroughbred interests than ClassicStar could support.  One major promoter of the Programs, PCG, knowing Wilmington Trust had numerous clients with substantial wealth such as the Teffeaus, approached Wilmington Trust to promote the Programs.

52.     Specifically, in May 2002, Wolf was invited by Forman of PCG to attend a seminar which PCG was sponsoring to learn about innovative wealth management opportunities.  At that seminar, one of the speakers presented was Plummer, who introduced Wolf to the ClassicStar Programs and the tax benefits and income potential available to its participants.  Wilmington Trust agreed to promote the Programs with the assistance of PCG to its clients, and to share in the commissions paid to PCG.

Wilmington Trust also profited by providing financing to its clients who purchased the Programs.

53.     The national sales force, including Wilmington Trust, were paid extravagant commissions and fees (*viz.,* kickbacks), hidden from Plaintiffs, to promote the Programs by falsely representing the *bona fides* of the Programs, by them recommending, promoting and selling the Programs to their unsuspecting wealthy clients as a virtually risk-free business opportunity with high returns on their capital invested, and substantial tax benefits.   Wilmington Trust, Coccetti and Wolf shared in 7% commissions (with PCG) on the sale of the Programs to Plaintiffs and secreted this fact from Plaintiffs despite Wilmington Trust's claims that avoiding conflicts of interest or even the appearance of any conflicts is "paramount".   Wilmington Trust has steadfastly denied it received such commissions and Plaintiffs only recently confirmed that Wilmington Trust <u>did</u> receive commissions.

54.     In order to obtain the significant tax advantages, the Defendants advised Plaintiffs on numerous occasions that the Programs required active participation and were not passive investments.   Plaintiffs would need to attend thoroughbred sales, participate in the selection of broodmares and the appropriate stallions with which to breed, board the mares and their offspring, and decide whether to sell the foals or retain them to race or breed.   In March 2003, the Teffeaus incorporated Sea Song Farms as their thoroughbred operation.   Sea Song still exists and still owns, breeds and boards thoroughbred horses in Central Kentucky.   Plaintiffs did (and continue to do) all of these activities and more as active Kentucky-based thoroughbred breeders and owners.

55.     The CS Defendants, ClassicStar and Wilmington Trust, through Coccetti and Wolf, represented that ClassicStar would acquire quality thoroughbred mares at fair market value and breeding rights to quality, suitable stallions at fair market value, and the foals to be produced by the matings would be the property of the Program participants.

56.     These representations were materially false and misleading when made because ClassicStar borrowed money from Fifth Third Bank to purchase the mares, usually 50%.   Fifth Third acquired a security interest in the mares, any offspring, including *in utero* foals, breeding rights, etc.   Wilmington Trust did not disclose this – instead it created the impression that this transaction was "bankable" because it offered the transaction financing.[2]

57.     Wilmington Trust loaned Plaintiffs over $12.3 Million to participate in the ClassicStar Programs and protected its interests by collateralizing the debt with Plaintiffs' other marketable securities and assets held by Wilmington Trust (*viz,* real estate, insurance policy and cash balances).   In truth and in fact, all the thoroughbreds were already fully mortgaged, including the *in utero* foals, that were supposed to be the exclusive property of Plaintiffs.   Wilmington Trust was aware of this fact, or in the exercise of reasonable care, should have known, yet it failed to advise its clients, like the Teffeaus.

58.     Plaintiffs borrowed nearly 90% for the 2003 Program and 100% of the 2004 Program from Wilmington Trust.   That ensured that Wilmington Trust would receive huge commissions as ClassicStar only paid commissions on money actually

---

2       ClassicStar provided many of its participants with financing through an affiliated company, NELCO, which was a sham as no money was transferred from NELCO to ClassicStar.   These Plaintiffs, however, borrowed and repaid real money ($12.3 Million) and paid real interest (over $2 Million) to Wilmington Trust to invest in the thoroughbred breeding Programs.

received - as opposed to the sham NELCO loans – which, upon information and belief, never resulted in any funds being transferred from NELCO to ClassicStar.   In addition to the commissions received by Wilmington Trust (believed and thus alleged to be in excess of $365,000)[3] on the Programs it recommended to Plaintiffs, Wilmington Trust received millions of dollars in interest and fees from Plaintiffs generated on its loans.

59.     As participants in the 2003 and 2004 Programs, Plaintiffs paid over $2 Million for mortality insurance on the horses and their names never appeared on the insurance policy, not even as an additional named insured.  See, Schedule A's for the 2003 and 2004 Programs attached hereto as Exhibit 1.  ClassicStar was listed on the insurance policy and Fifth Third was named as an additional insured.  Neither one of those parties paid any portion of the insurance premium since Plaintiffs paid all the premiums.  Plaintiff was never made aware of this fact by Wilmington Trust and only learned the true nature of the mortality insurance and its grossly inflated price in the Programs in 2008 when so advised by their counsel.

60.     The scheme was to promote and sell through Wilmington Trust and others far more Program interests than ClassicStar's existing mares and stallion nominations would support.  Due to a thoroughbred's eleven-month gestation period, a Program would typically require that the selected mares would be unavailable for an extended period of time.  If, however, buyers of the Programs could be induced to pay full value and then sell their interests in the Programs, the mare could be leased again to another purchaser, who would in turn pay full value for the lease, breeding rights, insurance and boarding costs.  Under Defendants' scheme, the same mare could be "leased" over and

---

3       Upon information, belief and investigation, ClassicStar paid a 7% commission on the Plaintiffs' two programs.  That approximately $861,000 was split 15% to PCG's home office, 42.5% to Forman's PCG office and 42.5% to Wilmington Trust, Wolf and Coccetti.

over to a series of purchasers, each time at "full value." Each subsequent lessor would pay the full insurance costs and boarding fees previously paid by the earlier participants and received by the CS Defendants. By constantly re-leasing the same mares over and over again to new investors, the CS Defendants, ClassicStar and its affiliated entities would maximize the income stream and the sales force, including Wilmington Trust, could maximize commissions received on the increasing sales.

61.     In addition to re-leasing the mares and re-charging the attendant costs, the Programs were destined to fail because 60% of all funds invested in the Programs (after the 7% commissions) were being siphoned off the Programs and utilized to invest in oil and gas drilling operations. Pursuant to a contract denominated "Amendment to Membership Purchase Agreement" between ClassicStar Farms, Inc., ("Buyer") and Plummer, Spencer and Debora Plummer (Plummer's wife) ("Sellers"), effective October 31, 2001, Plummer, his wife and Spencer contracted to sell their interests in Tartan Business, L.C. on the condition that, once the Seller was paid the remaining $1 Million owed (of the $6 Million consideration), then 60% of the funds raised in selling the Programs would be invested in oil and gas exploration.

62.     Specifically, the Agreement provides: Once the full cash portion of the Purchase Price has been paid to seller, **ClassicStar shall retain forty percent (40%) of all funds and proceeds received from Mare Lessees for working capital. The remaining sixty percent (60%) of such funds and proceeds received from Mare Lessees by ClassicStar shall be sent to Buyer in exchange for a commensurate amount of interests in the Drilling Program conveyed to Classicstar.** The Amendment to Membership Purchase Agreement is attached hereto as Exhibit 2, and

incorporated herein by reference.  Including the 7% commission, fully two-thirds (67%) of all the funds raised in the sale of the Programs were being looted by the CS Defendants and others to fund their oil and gas operations.  The CS Defendants knew of this fact, but failed to ever disclose it to Plaintiffs.  Likewise, Wilmington Trust knew, or in the exercise of reasonable care, should have known, that 67 cents of every dollar raised by the Programs was utilized to fund oil and gas exploration, yet Wilmington Trust recommended that Plaintiffs, and other of their wealth management clients, invest substantial portions of their net worth in the fraudulent Programs.

63.     Wilmington Trust introduced the Plaintiffs to the Programs as a prudent business opportunity to fulfill Plaintiffs' need for tax planning and wealth preservation. Wilmington Trust and the CS Defendants explained that mare leases represented a proven method of participating in the thoroughbred industry with minimal risks.

64.     Wilmington Trust first introduced the concept of mare leasing to Plaintiffs towards the end of 2002.  Lew Teffeau was interested in learning more about the Program, so Wilmington Trust arranged a trip for him, Coccetti and Wolf to travel to Lexington, Kentucky to further investigate.   Wilmington Trust promoted and recommended the Programs prior to and during the January 2003 trip to Lexington. Wilmington Trust, through Coccetti and Wolf, reviewed and approved the ClassicStar materials which represented that participation in the equine industry had certain tax advantages and that prior Program participants had all enjoyed substantial profits while in Lexington, and elsewhere.  Wilmington Trust, through Coccetti and Wolf, explained that taxpayers who <u>actively</u> <u>engage</u> in the horse breeding business would be entitled to *legally* deduct as ordinary and necessary business expenses the amounts that he or she invested

in the business in the year the costs were incurred.  Such ordinary expenses would include insurance, board fees, stud fees, and the cost of leasing a mare if the taxpayer chose to enter into a leasing program, rather than make an outright purchase.

65.     While in Lexington, in January 2003, Coccetti and Wolf confirmed and recommended ClassicStar as an excellent, tax-advantaged business opportunity which would generate substantial tax savings and a significant return on investment.  Coccetti and Wolf told Plaintiffs that they and others at Wilmington Trust had analyzed and reviewed, *i.e.*, "scrubbed" and approved the ClassicStar promotional materials which stated that since the Program began in 1990, participants had enjoyed a 31% return on the total Program costs.  The materials further stated that with the leverage provided by its built-in financing, the program had returned an astonishing 1177% on cash investments since its inception.

66.     The ClassicStar promotional materials utilized by Wilmington Trust to entice Plaintiffs to invest expressly stated that the ClassicStar Program "is not a tax shelter".  This was important to Mr. Teffeau who repeatedly made his tax-saving objectives clear to Wilmington Trust – he did not want to do anything illegal or in violation of the tax code.    Wolf and Coccetti, with the assistance of the CS Defendants and ClassicStar, explained to Mr. Teffeau that the IRS and Federal Government encouraged the Programs, *i.e.*, agricultural-based businesses, by providing significant tax advantages, including a 5-year look back period to recover taxes previously paid, the ability to write off the total costs of the breeding operations in the year the costs were incurred, and the opportunity to convert ordinary income into capital

gains.[4]  Wilmington Trust encouraged Plaintiffs to participate in the 2003 ClassicStar Program and Wilmington Trust financed nearly 90% of that business venture.  As noted previously, Wilmington Trust's collateral to secure its capital does not include any security interest in the Programs.  Rather, Wilmington Trust secured its interest with the Teffeaus' real estate holdings and assets maintained at the bank.  The ClassicStar Programs were good enough for Wilmington Trust to promote, recommend and sell to its valued clients, but not good enough to collateralize its loans.

67.     Coccetti and Wolf arranged for the Teffeaus to come to Lexington to tour the ClassicStar facilities and to discuss the *bona fides* of the Programs in January 2003. Together, they toured the farms, checked the bloodstock, met ClassicStar employees, and discussed the ClassicStar promotional materials and Programs.  These materials included a tax opinion issued by Green at Karren Hendrix touting the tax advantages of equine-based businesses.  During this due diligence trip to Lexington, Plaintiffs decided to invest in the Programs based upon Wilmington Trust's "scrubbing" of the deal and the strong recommendations of Wilmington Trust's wealth management professionals, Coccetti and Wolf.

68.     The amount of the Teffeaus' investment in the 2003 program was later determined by Wilmington Trust based upon the Teffeaus' income tax liability for the previous years.  Plaintiffs signed a Letter of Intent with ClassicStar on February 10, 2003 (please see, Exhibit 3), committing to invest $7,026,282 into the 2003 ClassicStar Program.  Wilmington Trust wired or caused to be wired $818,640 to ClassicStar's bank from Plaintiffs' trust account at Wilmington Trust on February 14, 2003.  The remaining

---

4       Upon information and belief, the IRS has taken contrary positions in all of its audits of breeding operations which participated in the ClassicStar Programs.

$6,207,642 was financed by Wilmington Trust.  Of course, the Teffeaus paid interest on the debts to Wilmington Trust.  On June 3, 2003, Wilmington Trust caused the second installment of $2,694,501 to be wire-transferred to ClassicStar's bank account.  The final installment for the 2003 Program of $3,513,141 was wired by Wilmington Trust to ClassicStar on October 31, 2003.

69.     In exchange for the $7 Million, Plaintiffs leased 16 mares for one breeding season which were to be bred to stallions selected by Plaintiffs in Kentucky to produce foals.  When the foals were born, Plaintiffs would own them outright, or so they thought.  One of the heralded advantages of the Program was that it allowed breeders to prepay all the costs to produce the foals, including the mare leases, stallion fees, insurance for the *in utero* foal and then the live foal, boarding costs, veterinarian fees and farrier fees.  By prepaying, the Teffeaus were advised by Wilmington Trust, Coccetti, Wolf and the ClassicStar Defendants to deduct the entire cost of the program for the 2003 tax year (when the costs were incurred), and carry back a $7,108,918 loss to claim a refund of taxes previously paid. The Teffeaus applied for and received a refund from the IRS of $2,637,678, which upon its receipt was paid to Wilmington Trust to reduce the principal on their debt for the 2003 Program.

70.     Less than three months after the final installment was wired, on January 20, 2004, Mr. Teffeau received a telephone conference call from Spencer Plummer, Forman, Tony Ferguson and Marty Wolf to discuss selling his interests in the 2003 Program to GeoStar Corporation.  During the hour-long telephonic conference, Mr. Teffeau was advised of an opportunity to sell his 2003 Program, and as payment he would receive restrictive shares in Gastar stock, a publicly traded oil and gas exploration

company.  In addition to receiving stock valued at the purchase price of Plaintiffs 2003 Program, Plaintiffs would be guaranteed a substantial profit on the 2003 Program, due to a put option to sell the stock back to GeoStar exercisable on or before January 31, 2007.

71.    On the same day (January 20, 2004) Mr. Teffeau spoke, again by telephone, with his trusted advisors, Forman and Wolf about the proposal to sell his 2003 Program for Gastar stock.  Wolf recommended the transaction as a no-lose situation given the put option built into the proposal.

72.    Later that same day (January 20, 2004), Mr. Teffeau spoke with Coccetti, who was already aware of the proposal.  Cocetti, like Wolf, thought it sounded like a no-lose transaction for the Teffeaus.  The Teffeaus, however, were not particularly interested in the oil and gas industry; they were interested in breeding, raising and selling thoroughbred horses – just like they do today.

73.    Over the next several months, Mr. Teffeau discussed this new proposal at length with Coccetti and Wolf.  Mr. Teffeau spoke with Coccetti and/or Wolf by telephone on at least a dozen occasions from January 29, 2004 through June 2, 2004, to seek their advice and counsel as to whether Plaintiffs should agree to sell their 2003 Program and what tax and other ramifications the sale would cause.  Coccetti and Wolf represented that the sale would guarantee a multi-million dollar profit on the 2003 Program.  Wilmington Trust, through, Coccetti and Wolf, recommended that Plaintiffs sell their 2003 Program[5] and participate in the 2004 Program in order to stay in the

---

5    By selling the 2003 Program for 3.5 Million shares of Gastar, Plaintiffs would have a taxable gain equal to the amount they received since their basis in the Program was zero, *i.e.*, fully deducted from previous years income.  Wilmington Trust recommended that Plaintiffs enter into a contract with GeoStar which materially overstated the sales price, and therefore Plaintiff's taxable gain, by placing a $2 per share value on the restricted Gastar stock.  See, contract between Plaintiffs and GeoStar, attached hereto as Exhibit 4.  Plaintiffs would not have had the $7 Million taxable event, had the contract been silent as to the value of the stock promised to Plaintiffs.

thoroughbred business.   Coccetti negotiated what appeared to be better terms for the Teffeaus based upon the expectation that the Teffeaus would invest *at least* another $5 Million into ClassicStar's 2004 Program, which they did.

74.    Mr. Teffeau agreed to sell his interests in the 2003 Program in May 2004. The agreement was drafted by the CS Defendants and their attorneys.  In payment for the 2003 Program, Plaintiffs were promised 3.5 Million shares of restricted Gastar stock. The effect of the sale of the 2003 Program was to cause a large taxable event to occur, *i.e.,* a profit of $7 Million, when in truth and fact, there was no profit at all, taxable or otherwise.[6]

75.    To make matters worse, Wilmington Trust used the existence of the new taxable event as the *raison d'etre* for a second round of investment in the Programs; *i.e.*, the 2004 ClassicStar Program.  This, of course, triggered a second payment of hidden commissions for Wilmington Trust.  Plaintiffs signed a Letter of Intent on June 2, 2004, committing to invest another $6 Million in the 2004 Program.[7]  Plaintiffs' 2004 Letter of Intent is attached hereto as Exhibit 5.  PCG, Wilmington Trust, Coccetti and Wolf shared in the 7% commissions ($371,000) paid by the CS Defendants on Plaintiffs' 2004 Program.

76.    The problem with this business transaction (the sale of the 2003 Program) recommended by Wilmington Trust was twofold.  First, the transaction forced the Teffeaus to have to report to the IRS $7 Million in income, which materially overstated their true taxable income since they did not receive a $7 Million cash payment or equally

---

6    To add insult to injury, Plaintiffs have never received most of the 3,500,000 shares of restrictive stock; although all of their 2003 thoroughbred horse interests were sold to an entity related to ClassicStar.

7    Though committing to $6 Million, Plaintiffs actually invested $5.3 Million in the 2004 Program.

valued assets.  The 3.5 Million restricted, unmarketable shares of Gastar promised to Plaintiffs were trading at less than $2 per share when the agreement was finalized.  Wolf, a former CPA and former partner with a big six accounting firm, surely must have recognized that the stock was materially overvalued.  First, the restricted stock could not be sold, *i.e.*, converted to cash, for at least a year.  The restriction on selling the shares alone would result in a devaluation of about 50%, and the fact that the daily volume on the stock was about 150,000 shares at the time decreased its marketability and value even more.  Surely, Wilmington Trust's tax expert, Marty Wolf, understood these problems, and the problem caused by placing *any* value on the restricted share, yet they were never disclosed to the Plaintiffs.  Secondly, the Teffeaus <u>never</u> <u>received</u> the 3.5 million share payment they were entitled to receive.

77.     Wilmington Trust recommended a solution to the Teffeaus' first problem (the taxable event) - invest another $5.3 Million into the 2004 ClassicStar Program. Wilmington Trust again recommended and encouraged the Program and this time the bank offered and agreed to finance 100% of the 2004 Program.  Again, Wilmington Trust declined to collateralize the ClassicStar Program recommended to Plaintiffs.  Rather, Wilmington Trust protected its interest by collateralizing the Teffeaus' real estate holdings and accounts maintained at the bank.

78.     Plaintiffs again followed the advice of Wilmington Trust and their trusted wealth managers, Coccetti and Wolf.   Wilmington Trust wired $5.3 Million to ClassicStar's bank on October 14, 2004.  Plaintiffs paid an additional $462,646 in 2005 and 2006 to cover additional boarding and insurance costs for the foals. On top of that, the Teffeaus have paid nearly $2 Million in interest to Wilmington Trust (for the 2003

and 2004 Programs) and they recently paid back Wilmington Trust $9 Million for the ClassicStar Programs.  In all, Plaintiffs have invested capital of nearly $15 Million in the two ClassicStar Programs promoted and recommended by Wilmington Trust with truly disastrous results.  The IRS is questioning the deductions for the ClassicStar Programs, and the Service is pursuing the Teffeaus (and the other ClassicStar participants) for millions of dollars in taxes, penalties and interest.  See IRS Notice of Full Disallowance (related to the 2003 Program) dated January 8, 2007 at Exhibit 7.  Wilmington Trust's expert tax and wealth preservation strategies have decimated the Plaintiffs' financial wealth.

79.     For their $15 Million (including interest paid to Wilmington Trust), the Teffeaus received shares of Gastar stock from the 2003 program (valued at about $1 Million) and they received sales proceeds from the foals in the 2004 program of approximately $3.2 Million.  In addition to $15 Million spent by Plaintiffs, the IRS is claiming many millions of dollars more in taxes, penalties and interest as a result of Wilmington Trust's recommendations.  Wilmington Trust received about $2 Million in interest and hundreds of thousands of dollars in hidden commissions.  Not an appealing result (for the Teffeaus) from the world's premier wealth management firm which agreed to conduct comprehensive due diligence on any program, strategy, opportunity or advisor recommended to Plaintiffs to ensure that their wealth would be prudently and objectively protected.

80.     Working in concert with the CS Defendants, Wilmington Trust implemented a plan to promote and sell the Programs, which included:

(a)     Providing information regarding ClassicStar Programs to its wealthy clients, like Plaintiffs, while in Kentucky, and elsewhere.

(b)     Traveling to Kentucky to pitch the Program to Plaintiffs while visiting the farms and touring the ClassicStar facilities.

(c)     Making representations in Kentucky and elsewhere about the legitimacy and trustworthiness of ClassicStar, the individuals associated therewith and the Programs.

(d)     Making representations about the favorable tax advantages of Mare Lease Programs in Central Kentucky and elsewhere, provided Plaintiffs agreed to be active participants (which they were and are).

(e)     Organizing the due diligence trips for Plaintiffs and others to visit the ClassicStar facilities and other sites in and around Lexington.

(f)     Arranging personal presentations in Kentucky and elsewhere by Plummer, Spencer, Green and others to prospective purchasers of Programs who had been identified and arranged through the meetings with Wilmington Trust.

(g)     Attending presentations and other events in Kentucky such as ClassicStar "day at the races," where individual representatives of Wilmington Trust would lend credence to the *bona fides* of the ClassicStar Programs.

(h)     Presenting and distributing materially false and misleading tax and revenue projections which were purportedly designed for each individual investor.

(i)     Arranging lines of credit or other financing for Plaintiffs and other prospective purchasers to purchase Programs without having to liquidate other investments or using other liquid assets the purchasers had available, thereby creating the

appearance that huge projected gains would be enjoyed with no or little out-of-pocket expense.

(j)     Offering to assist the new thoroughbred owners in maintaining activity and participation logs and records required by IRS regulations in order to achieve the stated tax benefits.

(k)     Advising Plaintiffs to sell their 2003 thoroughbred business interests for alternate investments with guaranteed returns and advising Plaintiffs to remain in the thoroughbred industry by participating in the 2004 Program.

(l)     Promising continual involvement, advice and support to Plaintiffs and prospective purchasers following the purchase of Programs.

81.     Wilmington Trust, Coccetti and Wolf, knew that each owed a fiduciary duty to Plaintiffs, and that Plaintiffs looked to them for objective and prudent advice. They were paid fees by Plaintiffs for independent and unbiased advice with respect to their financial affairs.

82.     Wilmington Trust enticed Plaintiffs to invest in the Programs by offering the financing for the Programs.  By doing so, Wilmington Trust would be enriched in the following ways:

(a)     Unknown to Plaintiffs, Wilmington Trust had entered into a secret agreement with PCG to split the 7% commission paid by the Teffeaus for the Programs that they purchased.  The more the Plaintiffs invested in the Programs, the more money Wilmington Trust would receive, an essential element in the success of the scheme, since the only real money invested in the scheme was the cash invested by participants and

funds loaned by Wilmington Trust or other outside lenders which were actually sent to ClassicStar (as distinguished from the sham NELCO loan transactions).

(b)     Wilmington Trust loaned and has been repaid nearly all of the funds that the Plaintiffs used to acquire the Programs.  Those loans would be made by callable notes and fully secured by assets maintained in accounts at the bank and by Plaintiffs' real estate holdings.

(c)     By collateralizing the Plaintiffs' investment accounts (and requiring that they be maintained at Wilmington Trust), Wilmington Trust ensured it would earn management fees (of about 1% annually) on the millions of dollars of investment assets held by the bank and restricted by the bank's security agreements on the loans to Plaintiffs.

83.     Wilmington Trust knew, or in the exercise of ordinary care, should have known to warn Plaintiffs of the risks inherent in the purchase of the Programs, and that it was virtually certain that the represented benefits, in terms of economic return on the purchases, could not be realized.  Despite this knowledge, Wilmington Trust encouraged Plaintiffs to invest about half of their net worth in two ClassicStar Programs because of the gains Wilmington Trust would realize by inducing plaintiffs to participate.

84.     Wilmington Trust knew, or in the exercise of reasonable care, should have known, the following facts about the Programs and Wolf:

(a)     That there was an unlimited number of Programs for sale and that there were no limitations whatsoever on the number of Programs that could be sold in amounts as high as $30 million per person.

(b)     That the plan from the outset was to sell Programs at inflated prices.

(c)     The sale of Plaintiffs' 2003 Program created fictitious income of over $7 Million.

(d)     Wilmington Trust would then recommend to the Plaintiffs (who had just sold their 2003 Program) to participate in the 2004 Program to offset the fictitious income.

(e)     That Wilmington Trust, Coccetti and Wolf would earn even more commissions, fees and interest by virtue of Plaintiffs' participation in the Programs.

(f)     That Wolf was neither a Pennsylvania licensed CPA nor attorney, though he was held out as such by Wilmington Trust.

(g)     That following this plan would require Plaintiffs to borrow a large percentage of their overall wealth from Wilmington Trust, all secured for Wilmington Trust by liens on more traditional investments owned by Plaintiffs and held by Wilmington Trust.

(h)     That the Programs' assets, *i.e.*, the mares, foals and insurance policies, were subject to prior perfected security agreements, thus not available to collateralize the funds loaned by Wilmington Trust.

(i)     That 67% of the funds raised by the Programs went to oil and gas exploration ventures – and not horse-related expenses.

(j)     That in order to obtain the tax benefits of the Programs, a participant would have to prove the Programs were fairly priced (not overvalued) and

entailed difficult adherence to complicated tax regulations which were frequently the subject of costly disputes with the Internal Revenue Service and of uncertain outcome.

85.     In 2003, Plaintiffs' liquid assets totaled approximately $24 Million, and no reasonable, prudent wealth manager would have advised Plaintiffs to borrow $6 Million and invest it in a risk-laden business such as leasing and breeding thoroughbred horses, especially without conducing extensive due diligence on the Program and its principals.

86.     Coccetti and Wolf informed Mr. Teffeau that they and Wilmington Trust had carefully reviewed and analyzed the promotional materials and projected returns, and that they recommended the Programs.   The Programs had been "scrubbed" by Wilmington Trust and met with Wilmington Trust's approval.  In January 2003, while in Central Kentucky, Mr. Teffeau decided and confirmed to Coccetti and Wolf that he would participate in the Program.   Coccetti and Wolf said they would calculate the optimal amount to investment based upon Plaintiffs' previous tax returns and financial situation.

87.     The Teffeaus were also provided with tax opinions prepared by Karren Hendrix and Green which purported to offer opinions regarding the favorable tax treatments available for participants in the ClassicStar Programs. These opinions were prepared for the Programs with the understanding that they would be used to solicit potential participants, like the Plaintiffs.

88.     Wilmington Trust, through Coccetti and Wolf, presented the ClassicStar pro formas and promotional materials that had been prepared by ClassicStar and which promised a 30% return on Plaintiffs' total investments.   On January 27, 2003 and February 13, 2003, Wilmington Trust presented Plaintiffs with pro formas based upon

various investment amounts ranging from $7 Million to $10.5 Million.  Each pro forma provided by Wilmington Trust to Plaintiffs projected millions of dollars of gains on the Programs.  Said pro formas are attached hereto as Exhibit 6.

89.     The effort to induce plaintiffs to purchase Programs followed the plans that had been previously established, specifically:

(a)     In meetings at Wilmington Trust in late 2002, Coccetti and Wolf (with the assistance of PCG) introduced Mr. Teffeau to the concept of mare leasing and touted ClassicStar as a long-standing, legitimate business that had been thoroughly investigated by Wilmington Trust.

(b)     Coccetti and Wolf personally accompanied Mr. Teffeau to Kentucky to conduct further due diligence and to discuss the specifics of the Program.  Based upon the purported scrubbing by Wilmington Trust and recommendations made to Plaintiff Lew Teffeau in Lexington and elsewhere, ClassicStar's impressive Central Kentucky farms and facilities,  Mr. Teffeau decided to invest in the Programs during the January 2003 trip to Lexington.  Coccetti and Wolf also initiated and participated in telephone calls with Spencer and Plummer to discuss the business opportunity.  The purpose of accompanying Plaintiffs on such trips to Lexington and participating in the calls was to convey to Plaintiffs that Wilmington Trust, Coccetti and Wolf were knowledgeable about the thoroughbred industry and specifically the ClassicStar Programs, and concurred with the statements made by Spencer, Plummer, Green and others concerning the Programs.

(c)     While in Lexington, Wilmington Trust advised Plaintiffs to meet one or more of the CS Defendants to further discuss the Programs and ClassicStar.

(d)     Wilmington Trust approved the ClassicStar promotional materials, including the projected income regarding the Programs.  The Illustrations falsely represented the gains that the Plaintiffs could reasonably expect to receive.

(e)     During the January 2003 due diligence trip and in meetings and telephone calls before and after, Coccetti and Wolf of Wilmington Trust informed Mr. Teffeau that participating in the ClassicStar Programs would generate favorable tax consequences which complied with IRS guidelines.  Plummer, Spencer Plummer and Green similarly told Mr. Teffeau that the Programs complied with IRS guidelines for generating substantial tax benefits.  Wilmington Trust, Plummer, Spencer and Green represented that, by following their recommendations regarding active participation in the Programs, Plaintiffs could properly deduct the costs of the Programs as ordinary business expenses on their income tax returns.  They bolstered those statements by representing orally and in written materials that the IRS had never disallowed and would not disallow such deductions.  Those were false statements in that the Internal Revenue Service has contested the legality of the promised tax treatment of most, if not all, of the purchases of thoroughbred interests *via* the ClassicStar Programs.

(f)     Wilmington Trust advised Plaintiffs to borrow funds from Wilmington Trust to invest in the 2003 Program.

(g)     Wilmington Trust encouraged the 2003 Program by agreeing to loan Plaintiffs nearly 90% of the $7 Million investment.

(h)     Wilmington Trust, Coccetti and Wolf received a six-figure commission on Plaintiff's $7 Million purchase, which fact was intentionally hidden from Plaintiffs.

(i)     Wilmington Trust, through Coccetti and Wolf, represented that it would assist Plaintiffs in maintaining records to ensure compliance with IRS regulations in numerous conversations in late 2002 and 2003.

(j)     Wilmington Trust, through Coccetti and Wolf, recommended that Plaintiffs sell their 2003 Program and invest another $5.3 Million in the 2004 Program to offset the $7 Million fictitious taxable event created by the sale of Plaintiffs' 2003 Program.

(k)     Wilmington Trust encouraged the 2004 Program by agreeing to loan Plaintiffs 100% of the $5.3 Million investment.

(l)     Wilmington Trust, Coccetti and Wolf received a six-figure commission on Plaintiff's $5.3 Million purchase, which fact was intentionally hidden from Plaintiffs.

(m)     In or around November 2005, Forman told Wolf (but not Mr. Teffeau) that he had received some negative information and that he was concerned with ClassicStar and that Wilmington Trust should act to get its clients out of ClassicStar's 2005 Program.  Wilmington Trust failed to act on the warning and intentionally withheld the warning from its clients, including Plaintiffs.

90.     At no time did Wilmington Trust disclose the fact that it would be receiving a commission on Plaintiffs' ClassicStar Programs.

91.     A consistent pattern between ClassicStar and Wilmington Trust was that ClassicStar typically sent materials pertaining to the Plaintiffs' Programs to Coccetti and/or Wolf either before they were sent to the Teffeaus, or were sent simultaneously, for Wilmington Trust's vetting of the Programs and its related document.

92.     This pattern of communicating and coordinating through Wilmington Trust was part of the fraudulent scheme as Wilmington Trust's role as a promoter of the ClassicStar Programs made it an active participant in the operation and management of the scheme and it lent credibility and credence to the Programs and representations made by the CS Defendants and evidenced Wilmington Trust's continuing involvement.

93.     Wilmington Trust, through Coccetti and Wolf, intentionally misled Mr. Teffeau in its purported analysis of the respective investment opportunities for Plaintiffs, purposefully stating that the ClassicStar Program (and subsequent business opportunities in the oil and gas industry) were prudent business opportunities that met the criteria that the Teffeaus required, namely prudent tax planning and preservation of wealth.

**The Scheme Begins to Unravel**

94.     By mid to late 2005, the ClassicStar Defendants began to run into trouble honoring their obligations. This occurred in part because the financial lending organization (NELCO) that was affiliated with the CS Program was a sham. Upon information and belief, none of the purchase price financed by NELCO (typically 90%) was received by ClassicStar because NELCO had no money to lend – it was a complete fraud. The lifeblood of the ClassicStar Programs was purchasers who paid cash in full or who borrowed the funds from "legitimate" lenders like Wilmington Trust. Only in those cases did ClassicStar receive the full purchase price.

95.     Another reason that ClassicStar failed was because of the CS Defendants' agreement to divert 60% of the ClassicStar purchase money, which was supposed to fund the CS Program expenses, to unrelated oil and gas exploration efforts. The 60% haircut is in addition to the 7% gross commissions paid by ClassicStar.

96.     On September 30, 2005, one such promoter, Anderson Corporate Finance & Investments, Inc. ("Anderson"), filed suit in the Superior Court of Washington, and alleged in an amended complaint that it had successfully located numerous investors in ClassicStar Programs and ClassicStar owed Anderson in excess of $6.2 million dollars. See, *Anderson Corporate Finance & Investments, Inc. v. ClassicStar, LLC*, Civ. No. 05-1656 TSZ (U.S. Dist. Ct. W.D. Wash.) This means that Anderson, alone, between May 23, 2003 and September of 2004, sold Programs in excess of approximately $88,500,000, assuming a 7% commission rate.

97.     In early February of 2006, Plummer and Spencer Plummer left ClassicStar abruptly.

98.     On February 23, 2006, the Internal Revenue Service's Criminal Investigation Division ("CID") conducted a raid of the ClassicStar farms in Versailles, Woodford County, and seized the Programs' books and records pursuant to a search warrant.

99.     Upon information and belief, Plummer and Spencer Plummer (and perhaps other Defendants) have been identified as targets with respect to an investigation being conducted by the United States Attorney's Office of the District of Oregon, which pertains to the Plummers' activities in connection with ClassicStar and GeoStar.

100.    To date, multiple lawsuits had been filed by similarly situated victims of the ClassicStar Defendants fraudulent scheme.  These suits include *West Hills Farms, LLC v. ClassicStar, Inc., et al.*, United States District Court for the District of Kentucky, Docket No. 5:06-cv-00243-JMH; *McNeill v. GeoStar et al.*, United States District Court for the District of Utah, Docket No. 2:06-cv-00911-TS-DN; *Associated Communications*

*Services, Inc. v. GeoStar Financial Services Corp., Inc.*, United States District Court for the Eastern District of Michigan, Docket No. 1:06-cv-14928-TLL-CEB; *Beechglen Farms, et al. v. ClassicStar et al.*, United States District Court for the Central District of Utah, Docket No. 2:07-cv-0001-PGC; and *J&L Canterbury Farms, LLC v. ClassicStar, LLC*, United States District Court for the Eastern District of Pennsylvania, Docket No. 07-cv-163.  All of those cases have been transferred to the Multidistrict Litigation Panel in the United States District Court for the Eastern District of Kentucky under MDL No. 1988.  A common scheme is alleged in many of these cases wherein the Programs were misrepresented, sold and purchased, exchanged for other business opportunities with related entities which subsequently refused to honor their contractual obligations.

### V.    THE RICO PREDICATE ACTS

101.    The defendants conspired to and did engage in mail fraud, wire fraud and bank fraud in violation of 18 U.S.C. § 1341, § 1343 and/or §1344 by using, or causing to be used, the United States mail, interstate wire communications, and funds held in national and state chartered banks in furtherance of and for the purposes of executing schemes to defraud and to obtain and maintain money by false pretenses.  Each use of the mails or interstate wire communications in furtherance of and for the purposes of executing the schemes constitutes a separate and distinct violation of 18 U.S.C. §1341, §1343, and/or §1344.

102.    Defendants used mail and wire communications to induce plaintiffs' participation in ClassicStar Mare Leases, to fund the Plaintiffs' investment in the Programs by wiring funds maintained at Wilmington Trust, to collect the proceeds of sale of ClassicStar Mare Leases, to conceal the overselling of the Mare Leases, to provide

information related to the tax treatment of the Mare Leases, to encourage investors to convert their Mare Leases into other investments with entities related to the CS Defendants, and to forestall Plaintiffs' inquiry into the scheme.

103. Defendants' use of the United States mail and interstate wire communications were made with the intent to defraud plaintiffs. Plaintiffs reasonably relied upon Defendants' misrepresentations, including those relating to the nature of the Programs.

104. Some, but not all, specific examples of the use of mail and interstate wire communications in furtherance of the scheme to defraud Plaintiffs and other investors are set forth above and also include the following:

**ClassicStar Defendants and ClassicStar, LLC (ClassicStar)**

(a) On or about December 1, 2000, Karen, Hendrix & Associates provided David S. Plummer with a tax opinion letter, which was distributed *via* United States mail and/or wire transmissions to prospective clients, CPAs, attorneys and tax advisors.

(b) On or about June 13, 2001, Terry Green provided David S. Plummer with a tax opinion letter regarding carry-back of net operating losses arising from horse-breeding business, which was distributed to prospective clients *via* mail and/or wire transmissions, CPAs, attorneys and tax advisors.

(c) On or about September 1, 2001, Terry Green provided David S. Plummer with a tax opinion regarding mare lease program tax benefits for clients engaged in farming activities, which was distributed *via* United States mail and/or wire transmissions to prospective clients, CPAs, attorneys and tax advisors.

(d)     On or about September 10, 2001, Terry Green provided David S. Plummer with a tax opinion letter regarding the exchange of mare lease interests for working interests in gas wells, which was distributed *via* United States mail and/or wire transmissions to prospective clients, CPAs, attorneys and tax advisors.

(e)     S. David Plummer mailed a letter dated September 24, 2001 to prospective clients, CPAs, attorneys and tax advisors forwarding a table summarizing annual foal sales and representing that foals had sold for 299% of the cost to produce the foal.

(f)     On January 3, 2002, Mr. Plummer sent a letter enclosing a Due Diligence Book to prospective clients, CPAs, attorneys and tax advisors.

(g)     On or about October 21, 2002, Terry Green emailed David Forman with recalculations of Mr. Teffeau's net-operating loss.

(h)     On or about January 19, 2003, Spencer D. Plummer III, President of ClassicStar, sent Plaintiffs a letter setting forth the income and expenses paid to ClassicStar for the year 2003.  The letter was intended to be provided to Plaintiffs' tax advisor to assist in the preparation of Schedule F of the Plaintiffs' 2003 tax return.

(i)     On or about February 13, 2003, ClassicStar mailed Plaintiffs a Letter of Intent with respect to the 2003 Mare Lease Program.

(j)     On or about April 15, 2003, Mindi Morishita of ClassicStar mailed Plaintiffs a letter enclosing a document authorization form for the Teffeaus to sign and return.

(k)     In or around May 2003, Mindi Morishita of ClassicStar emailed Kevin Coccetti wiring instructions for Mr. Teffeau's second installment of his investment in the 2003 mare lease program.

(l)     S. David Plummer sent an email on May 15, 2003 to Kevin Coccetti enclosing the ClassicStar pro-forma for Mr. Teffeau's investment in the 2003 Mare Lease Program.

(m)     On or about October 9, 2003, Mindi Morishita of ClassicStar mailed Plaintiffs a letter summarizing the Teffeaus' recent visit to Keeneland in Lexington, Kentucky.

(n)     On or about December 15, 2003, Mindi Morishita of ClassicStar mailed Plaintiffs a letter summarizing the Teffeau's activities at ClassicStar on November 14, 2003 and November 15, 2003.

(o)     S. David Plummer held an interstate conference call on January 20, 2004 with Mr. Teffeau, David Forman, Tony Ferguson, and Martin Wolfe regarding the ClassicStar Program.

(p)     On or about February 21, 2004, Spencer D. Plummer III emailed Alan Gottlieb, David Forman, Kevin Coccetti and Martin Wolf explaining that ClassicStar has "sweetened the deal" in expectation of Mr. Teffeau investing in the 2004 mare lease program.

(q)     In or around May 2004, S. David Plummer mailed the Teffeaus a Due Diligence Binder and interactive CD for the 2004 Mare Lease Program.

(r)     Mr. Ferguson made an interstate phone call to Mr. Teffeau on May 19, 2004 regarding ClassicStar buying back horses owned by Mr. Teffeau.

(s)     On or about June 2, 2004, ClassicStar mailed Plaintiffs a Letter of Intent with respect to the 2004 Mare Lease Program.

(t)     On or about June 30, 2004 Spencer D. Plummer III mailed an open letter to ClassicStar clients, including Plaintiffs, inviting them to participate in the 2004 Mare Lease Program.

(u)     Boyce Sanderson and Nick Plummer, acting on behalf of ClassicStar, held a conference call on October 31, 2004 with Mr. Teffeau regarding the PowerFoal program.

(v)     On or about December 6, 2004, Mindi Morishita of ClassicStar mailed Plaintiffs a letter enclosing the 2004 ClassicStar Mare and Stallion Selection CD.

(w)     On or about December 29, 2004, Tony Ferguson, acting on behalf of ClassicStar, emailed Mr. Teffeau regarding his conversation with Greg Bertsch and Mr. Teffeau's investment in the 2004 mare lease program.

(x)     On or about January 5, 2005, Mindi Morishita of ClassicStar mailed Plaintiffs a letter regarding horse trade outs for the 2003 Mare Lease Program.

(y)     On or about January 7, 2005, Spencer D. Plummer III sent Plaintiffs a letter inviting them to participate in the ClassicStar 2005 PowerFoal Stable program.

(z)     Mr. Plummer mailed a letter dated March 4, 2005 enclosing a 2004 Income/Expense Summary to Teffeaus for them to give to their CPA.

(aa)    On or about February 3, 2006, Boyce Sanderson emailed ClassicStar clients, including Plaintiffs, a memo from Tony Ferguson canceling Utah

meetings and rescheduling the meeting in Lexington, Kentucky for March 22, 2006 – March 24, 2006.

**Wilmington Trust, Wolf and Coccetti**

105.     During the period prior to the execution of the Mare Lease Agreement between Plaintiffs and ClassicStar on or about February 10, 2003, Wilmington Trust, through Kevin Coccetti and Martin Wolf, made to and received from Mr. Teffeau a number of telephone communications and wire transmissions relating to the Programs. In addition to those telephonic conversations and several others detailed above:

(a)     Wilmington Trust wired $818,640 to ClassicStar on or about February 14, 2003 for Plaintiffs' investment in the 2003 Mare Lease Program.

(b)     Wilmington Trust wired $2,694,501 to ClassicStar on or about June 3, 2003 for Plaintiffs' investment in the 2003 Mare Lease Program.

(c)     Wilmington Trust wired $3,513,141 to ClassicStar on or about November 3, 2003 for Plaintiffs' investment in the 2003 Mare Lease Program.

(d)     On or about February 21, 2004, Kevin Coccetti sent an e-mail, affecting interstate commerce, to Mr. Teffeau advising on various put and call pricing options and the profits therefrom, as offered by Spencer D. Plummer III to "sweeten" the deal.

(e)     On or about February 23, 2004, Martin Wolf placed a phone call, affecting interstate commerce, to Mr. Teffeau regarding the purchase of his horses by ClassicStar.

(f)     Kevin Coccetti placed a phone call, affecting interstate commerce, on March 1, 2004 to Mr. Teffeau regarding his meeting with Tony Ferguson about ClassicStar.

(g)     Mr. Coccetti made a phone call, affecting interstate commerce, to Mr. Teffeau on April 19, 2004 regarding ClassicStar.

(h)     On or about August 30, 2004 Mr. Coccetti sent an e-mail, affecting interstate commerce, to Mr. Teffeau detailing conversations with James Duggan and Bersch and the preparation of documents for the sale of Mr. Teffeau's mare lease interests back to ClassicStar.

(i)     Wilmington Trust wired $5,300,000 to ClassicStar on or about October 27, 2004 for Plaintiffs' investment in the 2004 Mare Lease Program.

(j)     Mr. Coccetti sent an e-mail, affecting interstate commerce, to Mr. Teffeau on March 3, 2006 confirming a conference call with Tony Ferguson.

106.    Defendants also utilized mail and interstate wire communications to solicit participation by other investors in the ClassicStar Programs and to persuade other investors to convert Mare Leases to alternate business models, including Leo Hertzog and Tom Morello.  The predicate acts are a regular way of Defendants doing business and are part of the manner in which Defendants conducted the enterprise.  Further, Defendants reasonably anticipated that their fraudulent scheme would require the use of mail and interstate wire communications.

107.    There are other similarly situated victims of Defendants.  The precise number of victims is not presently known.

## COUNT I - RICO
## ALL DEFENDANTS -18 U.S.C. 1962(c)

108.    The allegations of paragraphs 1 - 107 are incorporated by reference as if fully set forth herein.

109.    At all times relevant hereto, all of Defendants, *i.e.*, Wilmington Trust, Plummer, Spencer, Karren Hendrix and Green, constituted an association in fact and therefore are an "enterprise" as that term is defined in 18 U.S.C. §1961(4) and used in 18 U.S.C. §1962 (hereinafter the "ClassicStar Promoters Enterprise").   Each of the Defendants is a "person" as that term is defined in 19 U.S.C. § 1961(3).  The ClassicStar Promoters Enterprise was established and existed as an ongoing association engaged in or affecting interstate commerce, apart from the pattern of racketeering activity alleged in this Complaint.  The ClassicStar Promoters Enterprise engages in a pattern of activity that differs from the usual and daily activities of its members.  It oversees and coordinates the commission of several different predicate offenses and other activities on an ongoing basis.

110.    As a whole, Defendants acted in concert, with Wilmington Trust and other promoters having specific, well-defined roles in the ClassicStar Promoters Enterprise, to achieve the common goal of defrauding participants such as the Plaintiffs into making payments for the misrepresented Programs and then switching (or attempting to switch) participants into alternative investments.  The behavior of the Defendants is coordinated between and among themselves so that they function as a continuing unit.

111.    There was a consensual decision making structure, independent from the Defendants' regular business practices.  By agreement among Defendants, Wilmington Trust located wealthy individuals and promoted the Programs to such individuals.

Wilmington Trust stayed involved in the scheme once the individuals were located by acting as the intermediary between ClassicStar and the breeders, like Plaintiffs.

112.    Wilmington Trust further assisted participants, such as Plaintiffs, with maintaining records, lending money and facilitating contact with ClassicStar, Plummer, Spencer and Green, and provided an aura of legitimacy to the Programs.   The CS Defendants ran the horse operations and offered alternative investments to program participants such as the Plaintiffs.  Green and Karren Hendrix provided tax advice and opinions regarding the Programs that were distributed to potential participants, including Plaintiffs.   All of the Defendants conspired among themselves about how best to approach the potential participants, whether or not the potential participants would receive thoroughbred interests, how much the potential purchasers should invest, if, where, when and upon which terms to sell the Program interest, how to promote these Programs for maximum sales and commissions, and how to arrange funding for the Programs.   Wilmington Trust provided the financing for the Programs and strongly recommended the Programs to Plaintiffs and other of its clients as a prudent business opportunity.

113.    This consensual decision-making structure is evidenced by the manner and method of communications amongst the Defendants.  ClassicStar and the CS Defendants included Wilmington Trust, Coccetti and Wolf in their communications with Plaintiffs. They forwarded documents they intended to show Plaintiffs to Wilmington Trust, both to obtain Wilmington Trust's input and to have Wilmington Trust put its stamp of approval on the documents when discussing them and providing them to Plaintiffs.  ClassicStar, Plummer and PCG discussed the Programs with Wilmington Trust and Wolf prior to

discussing those investments with Plaintiffs.  ClassicStar, Plummer and PCG discussed the proposed alternative investments with Wilmington Trust and Wolf prior to discussing those investments with Plaintiffs.

114.    Each of the Defendants and ClassicStar participated in the operation or management of the ClassicStar Promoter Enterprise.  ClassicStar Farms, Plummer and Spencer managed the horses and operated ClassicStar Farms, which was a necessary element of the underlying scheme.  Wilmington Trust, through Coccetti and Wolf, for an undisclosed fee, located investors, promoted and recommended the Programs to them.

115.    Wilmington Trust, some or all of the CS Defendants and ClassicStar encouraged the switch to alternate businesses (like oil and gas producing properties or Gastar stock) in order to continue the scheme, sell additional Programs, and to further delay discovery of the fact that there were insufficient mares to justify the number of Programs being sold.

116.    These acts of Defendants and ClassicStar, including the conduct of the affairs of the ClassicStar Promoters Enterprise through a pattern of racketeering activity, took place over a period of several years and included multiple acts of mail fraud, wire fraud and bank fraud in violation of 18 U.S.C 1962(c).

117.    Defendants and ClassicStar have continuously engaged in criminal activities including, but not limited to, mail fraud, wire fraud and bank fraud as part of their overall scheme for over five years.

118.    Defendants' (and ClassicStar's) pattern of racketeering activity, including acts of mail fraud, wire fraud and bank fraud, have occurred within the relevant time periods outlined in 18 U.S.C. § 1961(5).

119.    Through their conduct of the enterprises, Defendants and ClassicStar have made or caused to be made or distributed communications by United States mail as well as by interstate wire transmissions which included misrepresentations of material fact and omissions of material fact regarding the Programs and the alternative business investments.  As detailed above, Defendants and ClassicStar have made or caused to be made interstate wire transfers of funds as a result of such misrepresentations and omissions and in furtherance of the criminal enterprise.

120.    By virtue of these and similar communications occurring over the past several years, Defendants and ClassicStar have engaged in an uninterrupted series of predicate acts of mail fraud, wire fraud and bank fraud that were related to one another in furtherance of the fraudulent schemes.

121.    All Defendants and ClassicStar conspired to and did derive or receive income from a pattern of racketeering activity, some part of which was used to operate ClassicStar, enabling ClassicStar to defraud Plaintiffs as set forth herein.

122.    As a whole, Defendants (and ClassicStar) acted in concert to achieve the common goal of defrauding participants such as the Plaintiffs into making payments for the Programs.

123.    As a direct and proximate result of Defendants' (and ClassicStar's) conduct as set forth herein, including their conduct of the affairs and participation in the ClassicStar Promoters Enterprise, Plaintiffs were injured in their business and property and continue to suffer injuries, including the amounts of their investments, interest paid on the loans for the Programs, uncertain tax liabilities, interest and penalties claimed by the IRS, and substantial legal expenses and costs.  Plaintiffs were persuaded to invest

over $12.3 Million in the ClassicStar Programs, paid nearly $2 Million in interest to Wilmington Trust, and have paid management fees to Wilmington Trust as a result of the criminal acts.

124.    Pursuant to 18 U.S.C. § 1964(c), plaintiffs are entitled to recover from defendants, jointly and severally, treble damages, their costs and reasonable attorney fees associated with this suit.

## COUNT II – RICO
## ALL DEFENDANTS – 18 U.S.C. §1962(c)

125.    The allegations of paragraphs 1 - 124 are incorporated by reference as if fully set forth herein.

126.    At all relevant times, ClassicStar was itself an "enterprise" as that term is defined in 18 U.S.C. §1961(4) and used in 18 U.S.C. §1962.  ClassicStar was created and has existed as an ongoing corporation engaged in or affecting interstate commerce, apart from the pattern of racketeering activity alleged in Count I of this Complaint. Specifically, ClassicStar was engaged in the business of breeding and raising thoroughbred horses.

127.    Defendants were associated with, agents of or employed by ClassicStar and each conspired to and did as part of that employment or association conduct or participate in the conduct of the affairs of ClassicStar through engaging in a pattern of racketeering activity.   Specifically, Plummer was the former CEO and Director of Marketing while Spencer was the former President of ClassicStar.  Wilmington Trust promoted ClassicStar Programs and was responsible for locating participants for a hidden commission.  Wilmington Trust also supplied financing to its clients, including Plaintiffs.

Green and Karren Hendrix provided prospective participants with opinions as to the tax benefits of the Programs.  In each of their respective roles, they conducted the affairs of ClassicStar.

128.   Defendants conspired to and did derive or receive income from a pattern of racketeering activity, some part of which was used to operate ClassicStar and ClassicStar Farms, enabling ClassicStar to defraud Plaintiffs as forth herein.

129.   As a whole, Defendants acted in concert to achieve the common goal of defrauding participants such as Plaintiffs into making payments for the Programs and then switching Plaintiffs into alternative business opportunities and/or investments that were worthless or nearly worthless.  Defendants offered the Programs and purported to provide information regarding the legitimacy of the Programs.  Defendants encouraged the participants to switch to alternative business investments in order to continue the scheme and to further delay discovery of the fact that there were insufficient mares to justify the number of Programs being sold.

130.   As a result, ClassicStar itself was a criminal enterprise which would not have functioned without the participation of the other Defendants, separate and apart from the enterprise described in Count I.

131.   These acts of these Defendants, including the conduct of the affairs of ClassicStar through a pattern of racketeering activity, took place over a period of several years and included multiple acts of mail and wire fraud in violation of 18 U.S.C. 1962(c).

132.   The Defendants have continuously engaged in criminal activities including, but not limited to, mail and wire fraud, as part of their overall scheme for at leave five years and will continue indefinitely unless prevented.

133. The Defendants' pattern of racketeering activity, including acts of mail fraud and wire fraud, have occurred within the relevant time periods outlined in 18 U.S.C. §1961(5).

134. Through their conduct of the enterprises, the Defendants have made or caused to be made or distributed communications by United States mail as well as by interstate wire which including misrepresentations of material fact regarding the Programs and the alternative investments. Defendants have made or caused to be made interstate wire transfers as a result of such misrepresentations.

135. By virtue of these and similar communications occurring over the past several years, Defendants have engaged in, and are continuing to engage in, an uninterrupted series of predicate acts of mail and wire fraud that were related to one another in furtherance of the fraudulent schemes.

136. There are many other similarly situated victims of these Defendants' scheme.

137. As a direct and proximate result of these Defendants' conduct as set forth herein, including Defendants' conduct of the affairs of and investment in the Programs, Plaintiffs were injured in their business and property and continue to suffer injuries, including the amounts of their investments, interest on the loan paid to Wilmington Trust, taxes, penalties and interest sought by the IRS, and legal expenses. Plaintiffs were persuaded to invest $12.3 Million in Programs and paid millions more in interest and management fees to Wilmington Trust as a result of the overt acts.

138.    Pursuant to 18 U.S.C. §1964(c), Plaintiffs are entitled to recover from Defendants, jointly and severally, treble damages and reasonable attorneys' fees and costs of suit.

## COUNT III - CONSPIRACY
## ALL DEFENDANTS - 1962(d)

139.    The allegations of paragraphs 1 - 138 are incorporated by reference as if fully set forth herein.

140.    Beginning from late 2002 and continuing until at least mid-2006, Defendants did knowingly and willfully conspire and agreed to conduct the affairs of ClassicStar through a pattern of racketeering activity.

141.    All of the Defendants knowingly agreed to facilitate the scheme to conduct the affairs of ClassicStar through a pattern of racketeering activity. Specifically, Plummer, Spencer, Karren Hendrix and Green agreed to facilitate the scheme by marketing the Programs, providing tax opinions to potential participants, directing ClassicStar's activities, permitting ClassicStar to falsely represent that it owned substantially more thoroughbreds than it actually owned, diverting 67 cents of every dollar invested in the Programs to commissions and to oil and gas ventures, and in actively persuading investors to switch to alternative business opportunities. Wilmington Trust similarly was aware of the scheme and facilitated it by offering financing to investors such as Plaintiffs, by purporting to offer independent investment advice, by actively persuading investors to switch to alternative investments, and by receiving and secreting commissions on Programs sold to its clients, including Plaintiffs.

142.    All these Defendants knowingly agreed to the commission of at least two predicate acts.

143.    The object of the conspiracy was to induce victims to invest millions of dollars in the Programs to generate income for the Defendants.  By recommending participants sell their interests in the Programs for interests in other entities, Defendants would be able to maximize their profits by leasing and re-leasing the same mares over and over.  The CS Defendants and ClassicStar would also be able to obtain millions of dollars from unsuspecting victims and misdirect 60% of that amount to their oil and gas ventures.  Defendant Wilmington Trust, along with Coccetti and Wolf, would also be able to profit by receiving hidden commissions on the sales of the Programs and Wilmington Trust would profit more by receiving fees and interest on loans from victims such as the Plaintiffs.

144.    Plaintiffs were injured by the commission of overt acts in furtherance of the conspiracy.  Plaintiffs were persuaded to invest over $12.3 Million in ClassicStar Programs and have paid over $2 Million in interest and management fees to Wilmington Trust as a result of the overt acts.  Moreover, the IRS is pursuing millions of dollars in taxes, interest and penalties as a result of Plaintiffs' participation in the ClassicStar Programs.

145.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants, jointly and severally, treble damages, their costs and reasonable attorney fees.

## COUNT IV - COMMON LAW FRAUD
## ALL DEFENDANTS

146.    The allegations of paragraphs 1 - 145 are incorporated by reference as if fully set forth herein.

147.    In order to induce Plaintiffs to purchase the Programs and to later sell the Programs and receive alternative investments as payment therefore, and with the intent that Plaintiffs rely upon their representations, Defendants intentionally made misrepresentations of material fact and intentionally omitted to disclose certain material facts which they had a duty to disclose as detailed above.

148.    The Defendants promised several important characteristics of the investment: 1) it was NOT a tax shelter; rather, it was a government approved and encouraged method to increase agricultural participation (breed and raise horses), to be able to convert expenditures to tax deductions and ordinary income to capital gains in a legal and legitimate manner; 2) these mare lease programs had years of experience and no prior participant ever lost money; 3) investors could reasonably expect to earn 131% on their total investment and over 100% on their actual cash outlay; and 4) the CS Defendants would pay out all the expenses for the benefit of the investors/participants/horses.

149.    The CS Defendants issued IRS Form K-1 to Plaintiffs for their 2003 and 2004 tax returns which stated that ClassicStar had spent $12.3 Million to pay for or prepay for the expenses associated with the mares they leased for breeding purposes.  On the basis of these K-1's, Plaintiffs unwittingly and unknowingly claimed $12.3 Million in deductions.

150.    The IRS has taken the initial position that these deductions were <u>not</u> legitimate.  Rather, most of the money (67%) went to Plummer, Spencer, ClassicStar and related entities, Wilmington Trust, other promoters, and others.  It is doubtful that even

33% of the $12.3 Million Plaintiffs invested in the Programs was ever spent on Plaintiffs' thoroughbreds.  See, Exhibit 7.

151.    As described above, from late 2002 on, in promotional materials and in presentations made to Plaintiffs in Kentucky and elsewhere, Defendants represented to Plaintiffs that Plaintiffs could legally claim the deductions described in connection with the Programs, that the CS Defendants had structured the programs to fall well within IRS requirements for such deductions, that the Programs complied with all applicable laws, that the Plaintiffs were provided thoroughbred interests and services of value equal to the amounts attributed to the Programs, and that the historical figures justified the projected returns referenced in the promotional materials and pro formas.  These representations were false.  The Internal Revenue Service is auditing virtually all of the ClassicStar Program participants and has disallowed deductions pertaining to the Programs. Defendants also did not disclose that the CS Defendants and ClassicStar did not have sufficient ownership of mares or stallions to support the number of Programs they were selling.

152.    Defendants also fraudulently represented that Plaintiffs could achieve guaranteed returns if they sold their 2003 ClassicStar Program and accepted as payment interests in Gastar stock.  Defendants knew that ClassicStar and its related entities did not intend to and/or could not honor the agreements with Plaintiffs in light of the agreements made with other Program participants, and therefore, the representations regarding guaranteed returns were false when made.

153.    Wilmington Trust, through Coccetti and Wolf, also made similar representations to Plaintiffs regarding Plaintiffs' ability to claim the deductions described

in connection with the 2003 and 2004 Programs and that the Programs were structured to fall well within IRS requirements for such deductions, and that the historical figures justified the projected returns referenced in the promotional materials and pro formas. Those representations were false.

154.    Wilmington Trust recommended in 2004 that Plaintiffs should sell their 2003 Program in exchange for a guaranteed upside, with full knowledge that the entities responsible for providing the guaranteed upside did not have sufficient funds to honor all of their contractual obligations to investors like the Plaintiffs.   Those representations were also set forth in the Programs' promotional materials (which were to be "scrubbed" by Wilmington Trust) and were false when made.

155.    All Defendants omitted to disclose to Plaintiffs the substantial risk of audit in connection with the Programs or that 60% of Program funds were invested in oil and gas exploration.

156.    Each of the foregoing representations was material to Plaintiffs, was false when it was made, and/or omitted material facts which Defendants had a duty to disclose.

157.    Defendants knew each representation as detailed above was false or made with reckless disregard for the truth or falsity of the misrepresentation, in that they knew they had no basis for the misrepresentation, or intentionally failed to disclose material facts.

158.    Plaintiffs reasonably and justifiably relied upon the representations to their detriment by, *inter alia*, their agreement to borrow funds, to purchase the Programs, and their payments for same.   Plaintiffs would not have agreed to participate in the ClassicStar Programs but for the misrepresentations and omissions of Defendants.

Plaintiffs also reasonably and justifiably relied upon the representations in selling their 2003 Program in exchange for other investments.

159.    Defendants committed this fraud and made said misrepresentations willfully, wantonly and with malicious disregard of the Plaintiffs.

160.    Plaintiffs are entitled to compensatory damages and punitive damages as a result of Defendants' intentional fraudulent acts.

**COUNT V - COMMON LAW FRAUD**
**WILMINGTON TRUST**

161.    The allegations of paragraphs 1 - 160 are incorporated by reference as if fully set forth herein.

162.    While holding itself out as a disinterested financial advisor which was charging fees for providing such objective and independent wealth management advice, Wilmington Trust was instead offering advice to further its own financial goals, with little or no regard for the Plaintiffs' interests.

163.    In its recommendations and advice, as detailed above, Wilmington Trust intentionally failed to disclose the fact that it would receive a commission based upon Plaintiffs' participation in the ClassicStar Programs.

164.    Wilmington Trust intentionally misrepresented to Plaintiffs that it would conduct a disinterested investigation, *i.e.*, reasonable due diligence, on the Programs. Wilmington Trust intentionally omitted to disclose that it was incapable of providing disinterested advice regarding the ClassicStar Programs, since it received hidden commissions.

165.    Wilmington Trust failed to disclose that it did not conduct a disinterested investigation or provide disinterested advice with regard to the sale of Plaintiffs' 2003

Program, since the sale was premised on Plaintiffs investing another $5.3 Million in the 2004 Program, for which Wilmington Trust would receive a commission.

166.    As detailed above, Wilmington Trust's recommendations and advice contained material misrepresentations and/or omitted material facts which it had a duty to disclose.

167.    Wilmington Trust misrepresented Wolf as a licensed Pennsylvania CPA, while all the while Wolf was not so licensed.

168.    Wilmington Trust misrepresented Wolf as a licensed Pennsylvania attorney, despite the fact that Wolf was not so licensed.

169.    Wilmington Trust knew each of these representations was false, or in the exercise of reasonable care should have known, or made each with reckless disregard for the truth or falsity thereof.  Wilmington Trust knew it had no reasonable basis for the representations, and intentionally failed to disclose material facts to Plaintiffs as detailed above.  Wilmington Trust did so with the intent that Plaintiffs would rely upon its advice.

170.    Plaintiffs reasonably and justifiably relied upon the representations to their detriment by, *inter alia*, their agreement to participate in the two ClassicStar Programs and their payments for the same.  Plaintiffs would not have agreed to participate in the ClassicStar Programs but for the material misrepresentations and omissions of material fact by Wilmington Trust.  Plaintiffs would not have relied completely upon the advice of Wolf had they known that Wolf was neither a licensed CPA nor an attorney.

171.    Additionally, Wilmington Trust, through its President Mark Graham, continued to defraud Plaintiffs until April 2009 by repeatedly telling Mr. Teffeau that Wilmington Trust would resolve his disputes with the bank.

172.    Plaintiffs reasonably relied upon Wilmington Trust's promises and have suffered damages as a direct and proximate result of their reasonable reliance upon Wilmington Trust's material misrepresentations, omissions and acts of overt fraud.

173.    Wilmington Trust committed these fraudulent acts intentionally and willfully.

174.    Plaintiffs are entitled to compensatory and punitive damages against Wilmington Trust as a result of Wilmington Trust's intentional and/or willful fraudulent actions as alleged herein.

## COUNT VI - BREACH OF FIDUCIARY DUTY
## WILMINGTON TRUST

175.    The allegations of paragraphs 1 - 174 are incorporated by reference as if fully set forth herein.

176.    Wilmington Trust entered into a fiduciary relationship with Mr. and Mrs. Teffeau wherein Wilmington Trust agreed to provide prudent, objective and independent tax planning and wealth management advice for a fee.   Wilmington Trust collected management fees for the services it provided to the Teffeaus.

177.    Wilmington Trust, in its capacity as a wealth manager and advisor to Plaintiffs, owed a fiduciary duty to them.

178.    Wilmington Trust had a confidential relationship with Plaintiffs and actively encouraged Plaintiffs to repose a high level of trust in Wilmington Trust, which Plaintiffs did.

179.    Wilmington Trust, through its Wealth Advisory Services, undertook to recommend suitable business opportunities, tax planning, and wealth preservation strategies to the Teffeaus.

180.    Wilmington Trust breached that fiduciary duty by recommending that Plaintiffs invest of almost 1/2 of their entire wealth in the ClassicStar Programs without conducting a disinterested investigation, *i.e.*, reasonable due diligence, on the programs and the principals involved.

181.    Wilmington Trust, through Coccetti and Wolf, knowingly represented that the Programs were prudent business opportunities that would have little risk and would achieve significant tax advantages with full knowledge that the investments were fraudulent, extremely risky, and that the Internal Revenue Service could disallow the claimed deductions.   They further intentionally represented that the Programs, and alternative investments in the oil and gas industry, had guaranteed outcomes, *i.e.*, no risk, with full knowledge that the Programs and alternative investment opportunities were extremely risky as ClassicStar and its related entities were unlikely to have sufficient assets to honor all of their future commitments.

182.    Wilmington Trust, Coccetti and Wolf received secret commissions totaling hundreds of thousands of dollars for recommending the ClassicStar Programs to Plaintiffs.  Wilmington Trust, Coccetti and Wolf did not disclose either the existence of or the amount of the commissions received on the Programs sold to the Teffeaus due to the obvious conflict of interest the commissions created.

183.    Wilmington Trust encouraged the Teffeaus' participation in the Programs by providing nearly 90% of the financing for the purchase of the 2003 Interests and 100% of the initial costs of the 2004 Program.  Wilmington Trust secured the loans using other valuable and marketable collateral, thereby insulating itself from any risk that the ClassicStar Programs would fail.  By loaning money, Wilmington Trust also ensured that

it would continue to receive interest on the loans, and management fees on the full value of Plaintiffs' invested assets, which were required to be held at Wilmington Trust pursuant to loan documents.

184.    The Plaintiffs relied upon Wilmington Trust to put Plaintiffs' interests ahead of their own, and to provide disinterested, competent and professional tax and wealth management advice.  Wilmington Trust did not do so and Plaintiffs were harmed as a result thereof.

185.    Plaintiffs are entitled to compensatory and punitive damages against Wilmington Trust as a result of Wilmington Trust's intentional breaches of its fiduciary duties to Plaintiffs.

## COUNT VII - UNJUST ENRICHMENT
## DEFENDANTS WILMINGTON TRUST, PLUMMER and SPENCER

186.    The allegations of paragraphs 1 - 185 are incorporated by reference as if fully set forth herein.

187.    Plaintiffs made payments to ClassicStar based upon the Defendants' false and misleading descriptions of the Programs, the horses involved in the Programs, and the services that they provided as part of those Programs, and these payments were deposited in accounts controlled by one or more of the CS Defendants.

188.    The Defendants further provided false and misleading descriptions of the Programs as detailed above.

189.    The CS Defendants and/or ClassicStar used a portion of these funds in furtherance of their fraudulent scheme, to pay hidden commissions to Wilmington Trust, and to purchase property held by Defendants Plummer and Spencer, including, upon information and belief, horses owned in Plummer's and Spencer's names.

190.    Plummer, Spencer and Wilmington Trust were not entitled to these funds, which were obtained from Plaintiffs through fraud and improper means, and Plaintiffs would not have borrowed the funds from Wilmington Trust (thereby committing to pay interest) or transferred the funds had the true nature of the transaction been known.

191.    Plummer, Spencer and Wilmington Trust were unjustly enriched by obtaining proceeds from Plaintiffs by fraud.

192.    As a result of the unjust receipt of these sums by Plummer, Spencer and Wilmington Trust, Plaintiffs have sustained damages, including the amount of their payments to Plummer, Spencer and Wilmington Trust.

193.    Plaintiffs are entitled to damages, jointly and severally, from Plummer, Spencer and Wilmington Trust due to the unjust enrichment of each resulting from the unlawful acts detailed herein.

## COUNT VIII - CONSPIRACY
## ALL DEFENDANTS

194.    The allegations of paragraphs 1 - 193 are incorporated by reference as if fully set forth herein.

195.    Each of Defendants agreed to and acted in concert with the others in carrying out the fraudulent scheme described above.

196.    Each of the Defendants performed acts in furtherance of the common fraudulent scheme.  The Defendants did so with the intent to injure the Plaintiffs by depriving the Plaintiffs of their property.

197.    Plaintiffs have suffered damages as a result of Defendants' concerted activities as described above, for which Defendants are jointly and severally liable.

## COUNT IX - NEGLIGENT MISREPRESENTATIONS AND OMISSIONS WILMINGTON TRUST

198.     The allegations of paragraphs 1 - 197 are incorporated by reference as if fully set forth herein.

199.     Alternatively, Wilmington Trust, through Coccetti and Wolf, negligently misrepresented and omitted material facts relating to the ClassicStar Programs as detailed above.

200.     Wilmington Trust, Coccetti and Wolf intended that the Teffeaus rely upon their wealth management, investment and tax planning advice, and the Teffeaus did, in fact, rely upon Wilmington Trust's advice.

201.     The Teffeaus have been harmed by their reliance upon Wilmington Trust's negligent tax planning, investment and wealth management advice which have resulted in millions of dollars in damages.  Moreover, they are currently being audited by the Internal Revenue Service, which is claiming millions of dollars more in taxes, interest and penalties.

202.     Plaintiffs are entitled to compensatory damages against Wilmington Trust as a result of Wilmington Trust's negligent acts and omissions as detailed above which caused damage to Plaintiffs.

WHEREAS, Plaintiffs respectfully demand as follows:

1.       Judgment upon their complaint against all Defendants;

2.       Compensatory damages;

3.       Punitive damages;

4.       Treble damages where authorized;

5.       Attorneys' fees and costs of suit, where authorized;

6.      Trial by jury on all issues so triable; and

7.      Any and all other relief to which Plaintiffs appear entitled.

BY:     /s/ Charles C. Mihalek
        CHARLES C. MIHALEK, P.S.C.
        Charles C. Mihalek, Esq.
        mihaleklaw@mis.net
        Steven M. McCauley, Esq.
        smccauley@mis.net
        167 West Main Street, Suite 510
        Lexington, Kentucky  40507
        (859) 233-1805
        (859) 233-7994 Facsimile
        Attorneys for Plaintiffs Sea Song
        Farms, LLC, Lewis T. Teffeau and
        Linda S. Teffeau

## EXHIBIT LIST

1.  Schedule A to the Mare Lease and Breeding Agreement between Lewis and Linda Teffeau and ClassicStar, LLC dated February 20, 2003 and Schedule A to the 2004 Mare Lease and Breeding Agreement dated December 23, 2004 between Sea Song Farms, LLC and ClassicStar, LLC.

2.  Amendment to Membership Purchase Agreement dated October 31, 2001 by and among S. David Plummer and Debora Plummer, Spencer D. Plummer III and ClassicStar Farms, Inc.

3.  Letter of Intent to pay ClassicStar $7,026,282 dated February 10, 2003.

4.  2003 Mare Lease Purchase Agreement and Conversion Terms dated July 1, 2004, by and between Sea Song Farms, LLC and ClassicStar, LLC.

5.  Letter of Intent to pay ClassicStar $6,000,000 dated June 2, 2004.

6.  January 27, 2003 and February 13, 2003 ClassicStar Pro Formas provided to Plaintiffs by Wilmington Trust.

7.  IRS Notice dated January 8, 2007 indicating full disallowance for deductions related to the 2003 ClassicStar Program.